**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Kelly Stewart, et al.,<br><br>    Plaintiffs<br><br>v.<br><br>SBE Entertainment Group, LLC, d/b/a/ Hyde LV LLC, et al.,<br><br>    Defendants | 2:15-cv-01569-JAD-NJK<br><br>**Order Granting Motion for Summary Judgment, Entering Judgment for Defendants and against Plaintiffs, and Closing Case**<br><br>[ECF No. 39] |

   Former cocktail servers Kelly Stewart and Danielle Harrington challenge their 2015 termination from Hyde Bellagio, alleging that Hyde's zero-tolerance alcohol policy was enforced selectively against them. Defendants move for summary judgment, arguing that plaintiffs' claims either lack evidentiary support or fail as a matter of law. I agree, so I grant defendants' motion for summary judgment, enter judgment for defendants and against plaintiffs, and close this case.[1]

**Background**

   Defendants SBE Restaurant Group, LLC and Spoonful Management LV, LLC operate Hyde Bellagio, a nightclub located inside the Bellagio Hotel and Casino in Las Vegas.[2] Kelly Stewart worked as a cocktail server at Hyde from its opening in December 2011 until January 2015,[3] and Harrington worked there from December 2012 until May 2015.[4]

**A.   Hyde's alcohol policy**

   When Hyde opened in 2011, its alcohol policy prohibited employees from drinking alcohol while on duty unless given permission from a manager and from being intoxicated or under the

---

[1] I find this motion suitable for disposition without oral argument. L.R. 78-1.

[2] ECF No. 39-28 at 5.

[3] ECF No. 43-2 at 5.

[4] ECF No. 43-4 at 2.

influence of drugs.[5] In November 2012, Hyde implemented its current zero-tolerance policy, which prohibits all drinking or being under the influence of drugs or alcohol while on duty, and requires employees who are suspected of being under the influence of drugs or alcohol to submit to an off-site drug or breath-alcohol test. An employee who violates the policy (by testing positive for drugs or having a blood-alcohol level of .02 or higher) is subject to "disciplinary action up to and including termination," and refusal to submit to testing results in "immediate termination."[6] The policy does not require a representative from the Culinary Union or Bartenders Union to be present for testing,[7] and union representative DiCillo confirmed in his declaration that the Union does not send a representative with an employee for testing.[8] Plaintiffs both signed a written acknowledgment of Hyde's zero-tolerance policy.[9]

**B.    Hyde's collective-bargaining agreement**

Hyde operates under a collective-bargaining agreement (CBA) between Bellagio and the Local Joint Executive Board of Las Vegas on behalf of the Culinary Workers Union Local 226 and Bartenders Union Local 165 ("Union").[10] The CBA also includes a zero-tolerance drug-and-alcohol policy that requires an employee who is suspected of being under the influence to submit to off-site testing "or suffer the penalty of discharge."[11] The CBA does not require that a union representative be present for testing.[12] The CBA states that employees may be discharged only for "just cause" and provides a grievance and arbitration procedure through which employees may challenge their

---

[5] ECF No. 39-2 at 2.

[6] ECF No. 39-3 at 2–3.

[7] *Id.*

[8] ECF No. 39-35 at 4.

[9] ECF No. 39-4 at 2–3.

[10] ECF No. 39-5.

[11] *Id.* at 4.

[12] *Id.*

discharge with Union representation.[13]

C.     **Plaintiffs are fired from Hyde.**

     *1.     Stewart was fired after she drank alcohol during her shift and refused testing; the Union declined to pursue her grievance.*

On January 20, 2015, management observed Stewart take a shot at one of the tables she was servicing and ordered her to the back office where she admitted that she had consumed a shot and a half glass of champagne with customers.[14] Management then asked Stewart to submit to an alcohol and drug test; she stated that she would not do so without a union representative present, and she was sent home.[15] She was terminated three days later.[16]

Three days after that, the Union notified Hyde management that Stewart was grieving her termination and requested a "meeting of a Board of Adjustment"[17] (BOA)—a meeting at which the employee, the Union, and employer meet for the purpose of resolving the grievances before arbitration and the parties make full disclosures of all the facts and evidence then known to them about the charge.[18] Two weeks after the meeting was held,[19] the Union withdrew Stewart's grievance because it "did not have sufficient merit to proceed to arbitration" and closed the case.[20]

---

[13] *Id.* at 6–8.

[14] ECF No. 39-10 at 2–3; ECF No. 39-29 at 18–19.

[15] ECF No. 39-10 at 2–3.

[16] ECF No. 39-11.

[17] ECF No. 39-14 (citing a violation of Article 6, Section 6.01(b) of the CBA).

[18] ECF No. 39-34.

[19] *Id.* at 4.

[20] ECF No. 39-15; ECF No. 39-4 at 4.

### 2. Harrington was fired after she appeared intoxicated at work and refused testing; the Union declined to pursue her grievance.

During her shift on May 1, 2015, Harrington was questioned by two managers about her alcohol consumption after three other servers noticed that she appeared to be intoxicated.[21] The managers noted that Harrington was having difficulty walking straight and that her eyes appeared dilated and bloodshot, and she admitted that she had taken "a couple of shots" before work.[22] Management told Harrington that she needed to submit to testing, and she twice refused.[23] Like Stewart, Harrington was sent home for the evening and terminated shortly thereafter.[24]

The Union informed Hyde that Harrington was grieving her termination and requested a meeting of a Board of Adjustment.[25] The Union determined that Harrington's grievance did not have sufficient merit to proceed to arbitration, so it withdrew the grievance and closed the case.[26]

### D. The lawsuit

Plaintiffs filed suit on August 14, 2015, alleging that they were discriminated against based on sex and subjected to a hostile work environment because they were treated less favorably than other female cocktail servers who were exempted from the drug-and-alcohol-policy and enjoyed special privileges because they engaged in consensual sexual relationships with managers and customers.[27] Plaintiffs allege that when they complained about this unfair treatment, defendants

---

[21] *See* ECF No. 39-18.

[22] *Id.* at 2.

[23] *Id.*

[24] Human Resources made several attempts to set up a due-process meeting with Harrington before her termination, but Harrington ultimately requested that HR just mail her the final paperwork. ECF No. 39-25.

[25] ECF No. 39-24.

[26] ECF No. 39-26; ECF No. 39-35 at 4–5. Harrington filed an Unfair Labor Practices Charge against the Union over its handling of her grievance. ECF No. 39-27. The NLRB ultimately abandoned the charge, and the Union is not a party to this lawsuit. ECF No. 39-35 at 5.

[27] ECF No. 34 at 5.

retaliated against them by falsely accusing them of consuming alcohol and then using their refusals to submit to a breath-alcohol test as a pretext to fire them.[28]  Stewart claims that defendants defamed her by "giving negative references to her prospective employers, including information about" this lawsuit.[29]

Plaintiffs assert claims for "unlawful employment practice," sex discrimination, and retaliation (under Title VII) and Nevada state-law claims for unlawful termination and defamation (Stewart only).  Defendants move for summary judgment, arguing that plaintiffs' claims fail because they were terminated for legitimate, non-discriminatory and non-retaliatory reasons, and that plaintiffs lack evidence to show that they were discriminated against based on sex or subjected to any conduct that could possibly constitute a hostile work environment, or that they engaged in any protected activity on which to base their retaliation claim.[30]

## Discussion

### A.    Summary-judgment standards

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[31]  When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[32]  If reasonable minds could differ on the material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed and the case must proceed to the trier of fact.[33]

If the moving party satisfies FRCP 56 by demonstrating the absence of any genuine issue of

---

[28] *Id.*

[29] ECF No. 24 at 10.

[30] *See generally* ECF No. 39.

[31] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[32] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[33] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue as to the material facts"; it "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in its favor.[34] The court may only consider facts that could be presented in an admissible form at trial in deciding a motion for summary judgment.[35]

**B.  Sex discrimination (claims one, two, and four)**

   *1.  Intentional discrimination or disparate treatment*

Courts apply the *McDonell Douglas* burden-shifting framework to Title VII discrimination claims. Under this framework, plaintiffs have the initial burden to establish a prima facie case of discrimination[36] by showing: (1) they belong to a protected class; (2) they were qualified for the position; (3) they were subject to an adverse employment action; and (4) similarly situated individuals outside their protected class were treated more favorably, or that a discriminatory reason motivated the employer.[37]

The burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.[38] If the employer does so, the plaintiffs must show that the articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the

---

[34] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson,* 477 U.S. at 248–49.

[35] FED. R. CIV. P. 56(c).

[36] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[37] *Id.*; *Reynaga v. Roseburg Forest Prod.*,--F.3d--, 2017 WL 370862 (9th Cir. Jan. 26, 2017) (explaining that Title VII discrimination plaintiffs need not show that similarly situated employees were treated more favorably and may alternatively show that a discriminatory reason motivated the employer).

[38] *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659 (9th Cir. 2002) (emphasis in original).

employer's proffered explanation is unworthy of credence."[39]  The plaintiffs' "evidence must be both *specific and substantial* to overcome the legitimate reasons put forth by" his employer.[40]

Plaintiffs fail to make a prima facie showing of sex discrimination.  Plaintiffs are members of a protected class—women—but they do not contend that they were discriminated against because they are women or that they were treated less favorably than similarly situated individuals *outside their protected class*.  Plaintiffs contend only that they were treated less favorably than similarly situated female cocktail servers, and this does not suffice under traditional Title VII principles.  Unfortunately for plaintiffs, servers who were not engaged in relationships with managers are not a protected class.

Even if plaintiffs could make a prima facie showing of sex discrimination, they fail to offer specific and substantial evidence to rebut defendant's explanation for their termination: they refused to submit to a breath-alcohol test as required by the employee handbook and the CBA—both of which call for immediate termination.  Plaintiffs have abandoned their allegations in the complaint that their terminations were pretextual because management falsely accused them of consuming alcohol, and each admitted during her deposition that she did in fact drink alcohol on the clock in violation of the policy on the night in question.[41]  Instead, to show pretext, plaintiffs now argue that there was uncertainty about Hyde's drinking policy, and they identify four *female* servers whom they claim were allowed to drink on the job while others like themselves were not.[42]  Even if these contentions were supported by the record,[43] neither gives rise to an inference that plaintiffs were

---

[39] *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

[40] *Aragon*, 292 F.3d at 659 (internal citations omitted) (emphasis in original).

[41] ECF No. 39-29 at 19; ECF No. 39-30 at 3.

[42] *McDonell Douglas*, 411 U.S. at 805.  That people outside the plaintiffs' protected class were treated better for offenses of comparable seriousness may help demonstrate pretext, but, again, other female cocktail servers are not people outside plaintiffs' protected class.

[43] That Hyde transitioned from the original policy to the zero-tolerance policy more than two years before plaintiffs were fired does not show that Hyde's drinking policy was applied in a discriminatory manner or was in a state of flux.  Both plaintiffs acknowledged receiving the zero-

targeted for alcohol testing because they were women or shows that Hyde's explanation is unworthy of credence.

### 2. *Sexual harassment*

Plaintiffs may also establish a discrimination claim under Title VII and Nevada state law based on sexual harassment.[44] There are two theories under which plaintiffs may prove actionable harassment. Under a quid pro quo theory, plaintiffs must show that a direct supervisor "explicitly or implicitly conditioned a job, benefit, or the absence of a job detriment, upon [their] acceptance of sexual conduct."[45] Under a hostile-work-environment theory, plaintiffs must show that they were (1) subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of their employment and create an abusive working environment.[46]

---

tolerance drinking policy and both clearly knew of its existence and enforcement. ECF No. 39-4 at 2–3.

Server Premak's testimony that, when she started in April 2013—approximately 21 months before Stewart was fired and 24 months before Harrington was fired—the servers were still allowed to drink champagne but that the zero-tolerance policy was later enforced also does not show that there was any uncertainty about Hyde's drinking policy when plaintiffs were fired. ECF No. 43-5 at 27. The same goes for the affidavit of former Hyde server Williams, who stated that servers were often punished for not consuming alcohol with high-paying customers. ECF No. 43-7. First, the statement is conclusory; it does not identify which servers were punished for not drinking with which customers, when they were punished, or how. Additionally, Williams stated that she only worked at Hyde from December 2012 until August 2013, so anything she observed would have little relevance to what Hyde was like in the months leading up to plaintiffs' terminations in January and May 2015. Nor does former server Rogers's conclusory testimony that the drinking policy "kind of always changed throughout the years" show that Hyde's specific, zero-tolerance drinking policy was generally not enforced, or that it was applied in a discriminatory manner against women. ECF No. 43-6 at 6.

[44] *Switzer v. Rivera*, 174 F.Supp.2d 1097, 1105 (D. Nev. 2001).

[45] *Id.* at 1054 (internal citations and quotations omitted).

[46] *Id.* at 1055.

Plaintiffs contend that they were subjected to sexual harassment because they were treated less favorably than servers who dated managers and customers.[47] The majority of courts that have been confronted with this issue have held that isolated incidents of preferential treatment based on consensual romantic relationships do not amount to sex discrimination under Title VII.[48] Though the Ninth Circuit has not yet reached the issue,[49] I find these courts' reasoning persuasive, and I conclude that favoritism based on a consensual romantic relationship between a supervisor and an employee, without more, cannot support a sex-discrimination claim under Title VII.[50] Plaintiffs may prevail on a sexual-harassment claim based on a sexual-favoritism theory only if they can show that the favoritism was so ubiquitous that it amounted to implied quid pro quo harassment or that it was sufficiently severe or pervasive to alter the conditions of plaintiffs' employment.[51]

---

[47] Though plaintiffs allege in their complaint that servers who dated customers received preferential treatment, the bulk of the evidence they cite relates to servers who they claim received preferential treatment based on their relationships with various Hyde managers. The only alleged special treatment that plaintiffs claim any server got for dating a customer was that she was allowed to drink with him or engage in physical contact with him when he patronized the club—behavior that would not ordinarily be allowed with customers who were not dating servers. *See* ECF No. 43 at 8.

[48] *See Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 382 (5th Cir. 2003); *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002); *Womack v. Runyon*, 147 F.3d 1298, 1300 (11th Cir. 1998) (per curiam) ("Title VII does not encompass a claim based on favoritism shown to a supervisor's paramour"); *Taken v. Okla Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997) ("Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification"); *Becerra v. Dalton*, 94 F.3d 145, 149–50 (4th Cir. 1996); *DeCintio v. Westchester Cty Med. Ctr.*, 807 F.2d 304 (2d Cir. 1986), *cert denied*, 484 U.S. 825 (1987); *Candelore v. Clark Cty Sanitation Dist.*, 752 F.Supp. 956, 960–61 (D. Nev. 1990).

[49] *Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 591 (9th Cir. 1992) (Kleinfeld, J., concurring) (citing *DiCinitio*, 807 F.2d 304).

[50] *Parker v. Otis Elevator Co.*, 9 F.App'x. 615, 617 (9th Cir. 2001).

[51] Ofc. of Legal Counsel, Policy Guidance on Employer Liability Under Title VII for Sexual Favoritism (Jan. 12, 1990) No. N-915-048 in 2 EEOC Compliance Manual foll.§ 615; *Miller v. Department of Corr.*, 115 P.3d 77 (Cal. 2005) (discussing EEOC Policy Statement No. N-915-048, and differentiating isolated incidents of sexual favoritism from widespread sexual favoritism, which may support a claim for sexual harassment under quid pro quo or hostile-environment theories).

### a. Quid pro quo theory

Plaintiffs fail to create a triable issue of quid pro quo harassment. They do not allege that they were subject to any sexual advances by management, and there is no evidence that defendants made any unwelcome sexual advances toward any of the servers or encouraged them to engage in sexual relationships with customers.[52] Nor is there any evidence that plaintiffs' jobs,[53] any job benefit,[54] or the absence of a job detriment were expressly or implicitly conditioned on plaintiffs' acceptance of sexual conduct with a manager or customer. For example, plaintiffs do not allege or offer evidence to show that they were denied shifts for which their seniority qualified them while less senior servers who engaged in sexual relationships with managers were awarded them.[55] I also do

---

[52] It appears, at least from Harrington's deposition testimony, that servers were permitted to break the rules and drink with customers not because of a romantic relationship but based on the server's ability to exponentially increase that customer's bill:

> And when you're in a good section, you sell champagne, you toast champagne with your guests, you drink champagne with your guests, and you keep everybody happy. I mean if a guest is spending $35,000, management doesn't say anything to those girls. ECF No. 39-29 at 9–10.

[53] Employees could be fired only for "just cause." ECF No. 39-5 at 6–8.

[54] Plaintiffs primarily claim that servers who dated management and clients were able to drink at work while they were not. Plaintiffs were not denied a tangible employment benefit by being denied the ability to violate Hyde's drug-and-alcohol policy. *Candelore v. Clark Cty. Sanitation Dist.*, 975 F.2d at 590 (affirming grant of summary judgment for employer where employee did not identify employment opportunities or benefits that were extended to less qualified female co-workers who responded to sexual overtures from work supervisors); *see also Olvera v. Sierra Nevada Coll.*, 2010 WL 185950 (D. Nev. 2010) (granting summary judgment on the plaintiff's Title VII claim where the plaintiff failed to identify employment benefits or opportunities that she was entitled to but did not receive because of the alleged improper relationship).

Plaintiffs also claim that a server who dated managers and clients was allowed to ignore their requests for help on the floor, "snap at" and be rude to them, not help with bottle service, and kiss, dance with, and sit on customers' laps. ECF No. 43 at 12. None of these things is a tangible employment benefit.

[55] Though plaintiffs conclusorily allege that they suffered unfavorable scheduling, which resulted in an unspecified loss of income, they offer no evidence to back up these assertions. This is probably because, as Harrington admitted at her deposition, scheduling after approximately February 2013

not find that the alleged sexual favoritism in this case was widespread[56] enough to support an implied quid pro quo claim, particularly because of the speculative and conclusory nature of plaintiffs' allegations and because they fail to identify a tangible employment benefit that was conferred as a result of the favoritism.

### b.   *Hostile-work-environment theory*

Plaintiffs argue that management's favoritism toward servers who dated managers and clients resulted in a hostile and abusive work environment because these servers were allowed to ignore and be rude to other servers; not help other servers; dance with, kiss, and sit on customers' laps; and drink at work; and they enjoyed better shifts and parking privileges and were not punished for rule violations.[57] Most of the testimony that plaintiffs cite to support these assertions is both conclusory and speculative. Regardless, even accepted as true and construed in the light most favorable to plaintiffs, these allegations do not establish a sexually hostile work environment.

---

was determined based on seniority, and before that it was based on a lottery system. ECF No. 39-29 at 7–8.

[56] In their opposition, plaintiffs identify four servers whom they claim were given preferential treatment based on their relationships with Hyde Managers: Grace, Cindy, Andrea, and Megan. The evidence that plaintiffs cite to establish that these women were in relationships with Hyde managers—let alone that they received preferential treatment because of these relationships—is completely speculative.

As to Grace and Cindy's alleged relationships, plaintiffs cite a third server's testimony that she "heard" that Grace and Cindy were in relationships with managers Klaasen and Arash, respectively, at some uncertain time but that she "didn't know for sure." ECF No. 43-6 at 4–6. This is wholly insufficient to create a genuine issue of fact for trial. As to Andrea, plaintiffs rely on former general manager James Plataniotis's statement in his affidavit that, although he lacked knowledge of Andrea's personal affairs, he "believed" that she was in a romantic relationship with someone higher up the SBE foodchain. But Andrea expressly denied this allegation in her deposition. ECF No. 43-12 at 8. The record does show that Megan was in a relationship (and is now married to) manager Danilovic, and plaintiff Stewart testified that she saw Megan drinking on the job with her then-boyfriend or fiancé Danilovic. But this is precisely the type of isolated preferential treatment that is not actionable under Title VII. *See* n.48, 51 *supra*.

[57] ECF No. 43 at 12–14.

Title VII is not a "general civility code."[58] To establish a violation, the environment must be both objectively and subjectively abusive.[59] Plaintiffs do not allege or offer evidence to show that they were subjected to unwelcome verbal or physical sexual advances by management or their coworkers, or that their co-workers were subjected to unwelcome advances by management and that they knew about it. And the record does not suggest that any sexual favoritism based on the consensual relationships between certain cocktail servers and managers was sufficiently severe or pervasive to alter the conditions of plaintiffs' employment and create a hostile, sexually charged work environment.

Additionally, there is no indication that plaintiffs themselves even considered their work environment to be abusive until after they were terminated. Hyde had a zero-tolerance policy for harassment, which both plaintiffs signed and acknowledged.[60] But plaintiffs never made any internal complaints about sexual harassment or sex-based discrimination. Because I find that no reasonable jury could conclude that plaintiffs were subject to an objectively and subjectively abusive work environment, plaintiffs' hostile-work-environment theory of harassment fails. Defendants are thus entitled to summary judgment on plaintiffs' discrimination claim under Title VII and Nevada's state-law analog[61] because plaintiffs lack evidence to show that they were discriminated against based on sex or that they were subject to sexual harassment under either a quid pro quo or hostile–work-environment theory.

**C.     Retaliation (claim three)**

To make out a prima facie case of retaliation, plaintiffs must show that they (1) "undertook a protected activity under Title VII," (2) defendants subjected them to an adverse employment action,

---

[58] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

[59] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).

[60] ECF No. 39-6 at 2–3; ECF No. 39-17 at 2–4.

[61] NEV. REV. STAT. § 613.330(1) is almost identical to Title VII, and courts apply the same analysis. *See Apeceche v. White Pine Cty*, 615 P.2d 975, 977–78 (Nev. 1980).

and (3) "a causal link between the two."[62] The burden of production then shifts to defendants to advance a legitimate, nonretaliatory reason for the adverse employment action. If defendants do so, then plaintiffs have the ultimate burden of showing that defendants' explanations are pretextual.[63]

Plaintiffs fail to make a prima facie showing of retaliation because they lack evidence that they made a protected communication under Title VII, i.e., that they complained about employment practices that they reasonably believed were prohibited under Title VII. [64] In response to defendants pointing out this glaring deficiency, plaintiffs argue that they "are allowed to rely on circumstantial evidence to establish the causal connection for the inference of retaliation" and then attempt to connect their other complaints—which are not protected by Title VII—to their firing.[65]

It is true that retaliation plaintiffs may show the requisite causal link between a protected communication and the adverse employment action through circumstantial evidence, but this does not relieve plaintiffs of their burden to show that they made a protected communication in the first place. Stewart's complaint about another server violating the company's drinking policy and Harrington's complaint that another cocktail server yelled at her are not protected communications about employment practices prohibited by Title VII.[66] Even if they were, the complaint that Stewart points to was made in September 2013—16 months before she was fired.[67] This proximity does not support an inference of retaliation, and Stewart offers nothing to link this complaint to her termination. As to Harrington, it is unclear when she voiced her unofficial complaint to

---

[62] *Vasquez v. Cty of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2003).

[63] *Steiner v. Showboat Operating Co.*, 25 F.3d 1464, 1465 (9th Cir. 1994).

[64] *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 525 (9th Cir. 1994) (an employee "must only show that she had a 'reasonable belief' that the employment practice she protested was prohibited under Title VII").

[65] ECF No. 43 at 14.

[66] There is nothing in the record to suggest that plaintiffs reasonably believed that they reported an employer practice that violated Title VII, especially because their complaints were about co-workers, not employment practices. *Trent*, 41 F.3d at 525.

[67] ECF No. 43-9.

management, but in any event, she testified that she does not believe that she was retaliated against because of it.[68]

Because plaintiffs lack evidence to show that they engaged in activity protected under Title VII or that they suffered any adverse employment action as a result, they have failed to establish a prima facie showing of retaliation, and defendants are entitled to summary judgment on plaintiffs' retaliation claim.

**D.    Defamation (claim five)**

An action for defamation under Nevada law requires the plaintiff to prove four elements: "(1) a false and defamatory statement; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages."[69] In support of her defamation claim, Stewart cites her deposition testimony that Crystal, another Hyde server, told her that another person had told her that Neil, a Hyde manager, had "basically . . . blocked [Stewart] from getting hired" at another nightclub.[70] Stewart's statement is layered hearsay that would not be admissible at trial, and it is wholly insufficient to create a genuine dispute of material fact for trial.[71] There is nothing in the record to suggest that anyone from Hyde made a false or defamatory statement about Stewart, or that this communication—which appears to have been made in response to a reference check—was not privileged. Accordingly, defendants are also entitled to summary judgment on claim five.

---

[68] ECF No. 43-4 at 53.

[69] *Clark Cty School Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 503 (Nev. 2009).

[70] ECF No. 43-4 at 17.

[71] Stewart admitted at her deposition: "I don't know the exact details of who told what, who told who, I just know I didn't get hired at Hakkassan Group." ECF No. 39-29 at 25.

**Conclusion**

Accordingly, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendants' motion for summary judgment **[ECF No. 39] is GRANTED.** The Clerk of Court is directed to ENTER JUDGMENT for defendants and against plaintiffs and CLOSE THIS CASE.

Dated this 7th day of March, 2017.

_____
Jennifer A. Dorsey
United States District Judge